IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES JERMAINE DAVIS,

            Plaintiff,

v.

CORRECTIONAL OFFICER GRIPENTROG
and SERGEANT STEINERT,

            Defendants.

OPINION AND ORDER

18-cv-91-slc

---

*Pro se* plaintiff James Jermaine Davis is proceeding in this lawsuit against defendants Jacob Gripentrog and James Steinert on Eighth Amendment deliberate indifference claims related to their failure to let him see a health care professional after Davis injured his finger. Before the court is defendants' motion for summary judgment. (Dkt. 28.) It's a close call, but there are disputes of fact that preclude summary judgment on Davis's claims against both defendants. Accordingly, I am denying defendants' motion for summary judgment and this case will proceed to trial.

UNDISPUTED FACTS[1]

Plaintiff James Jermaine Davis is in the custody of the Wisconsin Department of Corrections (DOC), currently incarcerated at Waupun Correctional Institution (Waupun). Defendants Jacob Gripentrog and James Steinert both are correctional officers at Waupun. Gripentrog has held that position since January 2016; Steinert since August 28, 2011. Davis's claims against them arise from how they each responded to his report that he had injured his finger on January 16, 2017.

---

[1] The following facts are material and undisputed, unless I note otherwise. I have drawn these facts from the parties' proposed findings of fact and responses, and the evidence cited in those proposed facts, as necessary. Davis's proposed findings of fact include citations to various DOC policies and procedures related to how DOC employees are to respond to the medical care needs of prisoners. For the most part, these citations are immaterial to Davis's claims, so they have been omitted.

## A. Gripentrog

On the morning of January 16, Gripentrog was working first shift. He and two other officers were assigned to supervise rec time in Waupun's gymnasium called "the Big Top." The Big Top is a large area in which prisoners can play basketball or handball, exercise, play board games or cards, or talk. Davis claims that at about 9:15 a.m., he dislocated his fourth finger playing basketball and snapped it back into place. Apparently this was the second time Davis had dislocated this finger. Davis claims he was in "excruciating pain."

At about 9:20 a.m., Davis approached Gripentrog about his dislocated finger. Since the majority of their interaction is disputed, I will start with Gripentrog's version of their interaction:

Gripentrog avers that Davis told him he hurt his finger playing basketball, and that he responded by asking Davis if he needed to go to the Health Services Unit (HSU), Davis responded "No, I'm good." Then, according to Gripentrog, Davis returned to playing basketball. Gripentrog claims that because Davis initially declined medical care and went back to playing basketball, Gripentrog did not believe Davis needed medical attention at that point.

Gripentrog claims that his next interaction with Davis took place about twenty minutes after Davis first approached him, at about 9:40 a.m. At that point, Davis approached him clenching his hand, complaining about his finger, and asking to see HSU. Because the rec period was about to end and Gripentrog had already asked one of the other officers to secure the area for transport, Gripentrog concluded that there were not enough officers available to transport Davis to HSU without creating a security risk. Therefore, says Gripentrog, he told Davis he would call HSU when they returned to the cell hall.

2

Davis's version is very different: Davis claims that when he first approach Gripentrog at 9:20, he told Gripentrog he had dislocated his finger and snapped it back into place. (Davis Decl. (dkt. 40) ¶ 41). Davis further claims – and another prisoner corroborates – that he showed Gripentrog his swollen finger and asked Gripentrog to call HSU so he could get medical treatment because he was in "excruciating pain." (Davis Decl. (dkt. 40) ¶¶ 6-7; Thomas Decl. (dkt. 41) ¶¶ 6-7.) Davis claims that Gripentrog responded by asking him if he could wait to see HSU, and that Davis responded that he could not wait. Davis claims he continued to beg Gripentrog to call HSU for him and that he did not go back to playing basketball. Davis claims that Gripentrog told him that he didn't feel like writing an incident report despite Davis's constant begging. Finally, when Davis threatened to file a complaint against him, Gripentrog ordered him to return to the cell hall.

Back in Davis's cell hall, Davis's and Gripentrog's version of events is largely undisputed. Gripentrog spoke with Steinert about Davis's injury, telling Steinert he would be contacting HSU. Gripentrog claims that he called HSU at that point, told a staff member about Davis's injury and that Davis initially said he was okay and continued recreational activities. (Gripentrog Decl. (dkt. 40) ¶ 13.) (While Davis purports to dispute this fact, he cites his own declaration, not any evidence that creates a material dispute about what Gripentrog actually did next. Accordingly, I accept Gripentrog's description of his report to HSU as undisputed.)

The HSU staff member responded that because Davis initially said he was okay, Gripentrog should tell Davis that if he wanted to be seen, he should submit a Health Service Request (HSR). Gripentrog relayed HSU's message to Davis, who, according to Gripentrog, did not appear upset or in extreme pain. That was the extent of Davis's interactions with Gripentrog

3

about his finger injury. Gripentrog avers that he did not write an incident report about his interactions with Davis because he did not perceive Davis's injury to be significant.

Davis claims that Gripentrog's failure to either call HSU immediately or fill out an incident report violated DAI Policies. Specifically, Davis points to DAI Policy #900.508.11, which requires Waupun staff to immediately contact a security supervisor and/or HSU staff if he or she believes an injury warrants such action. That policy also requires staff to fill out an accident report, form DOC-98A, after observing a prisoner accident.

### B. Steinert

Steinert was working in Davis's cell hall when Davis returned there after recreation, between 9:35 and 9:45 a.m. Davis approached Steinert and the two had a brief exchange,[2] the content of which they dispute. Steinert claims Davis told him he hurt his finger during rec and wanted to see HSU; Steinert responded that Gripentrog already had told him this, and that Gripentrog would be calling HSU. Therefore, Steinert told Davis to go back to his cell.

Davis claims he told Steinert he had dislocated his finger and snapped it into place, and that even though he was in excruciating pain, Gripentrog would not contact HSU for him. However, Davis does not dispute that Steinert told him that Gripentrog planned to call HSU.

About a half hour later, Davis approached Steinert again at the sergeant's desk, reporting excruciating pain and asking to be seen by HSU. According to Steinert, while Davis was making his request, Davis interrupted himself three different times by having conversations with passing

---

[2] Davis claims he spoke with Steinert in an effort to informally resolve his complaint about Gripentrog before he filed a formal inmate complaint against him. Davis's reason for interacting with Steinert is not material to defendants' motion for summary judgment.

prisoners.  Davis disputes this, and he also claims that Steinert refused to call HSU.  Davis claims he also asked Steinert whether Gripentrog had called HSU yet, and Steinert responded he did not know, reminding him to submit an HSR.

Steinert also claims that he called the HSU shortly after this interaction, reporting Davis's complaint but also that he was able to pause his complaint to Steinert multiple times to have conversations.  Like Gripentrog, the HSU staff member handling the call told Steinert to tell Davis to send and HSR if he wanted to be seen, and Steinert relayed the message to Davis.  Davis claims that Steinert never called the HSU, but he does not dispute that Steinert told him to submit an HSR.  (Davis Decl. (dkt. 40) ¶¶ 41, 56.)  Steinert admits that Davis's finger was swollen, but claims that Davis never appeared to be in excruciating pain during their interactions.

There is no documentation of Stenert's interaction with Davis or his call to HSU.  According to Steinert, unit staff are required to document emergency situations in the cell hall log book, and staff members are required to document when HSU is contacted for emergency situations, which typically would involve the prisoner being sent to the emergency room or hospital.  Davis claims that, like Gripentrog, Steinert violated DAI Policy #900.508 in failing to contact the HSU or fill out a DOC-98A.

**C. Davis's Subsequent HSRs and HSU Visits**

HSR forms were readily available to Davis on his unit during the morning of January 16.  HSR forms are the DOC's way of documenting prisoner requests for medical care and complains of symptoms.  Once a prisoner completes an HSR, it is placed in a designated box.  The evening nurse collects HSRs from each unit every night, and the night on-call nurse organizes the slips,

5

date-stamps them, and reviews every slip.  The nurse checks a box at the bottom of the slip to designate the next step for the prisoner's request, and initials that checked box.  Then a registered nurse triages the HSR slips and responds promptly, prioritizing appointments based on their training and judgment.  The nurses have the authority to call prisoners to the HSU immediately through a nursing sick call, scheduling the inmate to be seen in the HSU or referring the HSR to someone that can respond better than HSU staff.

In addition to Gripentrog and Steinert telling him to submit an HSR, Davis also claims that during second shift on January 16, he asked for help for his excruciating pain, but a non-defendant sergeant told him to submit an HSR.  Davis does not dispute that HSR forms were available to him.  Davis claims that he submitted one on January 16, after the second shift officer told him he would need to submit an HSR to be seen.  That HSR appears to have gone through the collection process outlined above, and was date-stamped as received by HSU on January 18.  In his HSR, Davis wrote:

> I would like to be seen "ASAP" please.  Today at rec, I had dislocated my finger again (some) and had to pop it back out.  I reported to rec officer that I need to be seen, because I'm in pain and it's swollen up again.  Thanks for consider[ing].

> (Ex. 1000-019 (dkt. 40-2).)

The nurse who reviewed the HSR checked the box indicating Davis was scheduled to be seen by "RN/LPN."  (*Id.*)

Davis claims that he submitted three subsequent HSRs; defendants dispute that Davis submitted any other HSRs related to his finger injury in January of 2017, and they point out that Davis had not submitted copies of those HSRs.  While Davis has not submitted copies of those HSRs, his declaration provides details about what he wrote in those HSRs.  In particular, Davis avers that he submitted a second HSR on January 17, 2017, writing "I'm in excruciating

6

pain and need to be seen regarding my finger." (Davis Decl. (dkt. 32) ¶ 32.) Davis claims he submitted a third HSR on January 18, writing that it was his third request and he was still in excruciating pain. (*Id.* ¶ 33.) Finally, he claims that he submitted a fourth HSR on January 19, this time writing that he was in the process of filing a complaint because he had not been provided medical care. (*Id.* ¶ 34.) There is no evidence suggesting either Gripentrog or Steinert knew about any of these HSRs. Rather, it is undisputed that neither defendant worked on January 17, 18, or 20 of 2017, and that neither recalls speaking with Davis on January 19, 2017.

HSU RN Gurlach examined Davis on January 20, 2017, based on Davis's January 16 HSR. Davis claims he reported to the nurse that he was in excruciating pain, rating his pain at a 10 out of 10. (Davis Decl. (dkt. #40) ¶ 36.) In the progress notes of that visit, however, the nurse wrote that Davis reported that his pain was a "5/6 out of ten" and that he told her:

> When I balled my fist up the pain is just there; I've been using ice and it's been taking the swelling down, but I'm still having [sic]. I was playing ball @ rec and my finger snapped back. This is the second time it's happened to the same finger.

(Ex. 1000 (dkt. 33-1) 4.) The nurse further noted: "Ligature between main knuckles loss/diminished with palpation; knuckle is less pronounced on R-hand than left," and diagnosed him with "musculoskeletal/alteration in comfort." (*Id.*) Both Davis and the nurse noted that he had injured the same finger in the same way on December 15, 2016. The nurse recommended Tylenol and a permanent medical restriction for cloth tape so that Davis could tape his third finger to his fourth finger during sports activities as a treatment plan. The nurse did not make a referral to an advanced care provider. Davis claims that while the Tylenol made

7

him feel better, he subsequently had to order Tylenol through the canteen and could only receive ice 3-4 times a day with a special needs medical restriction, which he did not have.[3]

On January 22, 2017, Davis submitted an HSR complaining about his knee. Davis did not mention any pain related to his injured finger. On January 26, Davis was seen by HSU and complained that his tonsils and throat hurt. He did not mention pain from his injured finger. Davis subsequently filed an inmate complaint against Gripentrog and Steinert, and an inmate complaint examiner investigated his allegations against them. According to Davis, neither Gripentrog nor Steinert provided documentation showing that they contacted HSU for him.

Davis did not file another HSR asking to be seen about his finger until November 20, 2017, when he complained that he was having trouble writing. At that point, Davis was seen by a nurse and she prescribed him some pain medication, muscle rub, and physical therapy for his finger.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v.*

---

[3] Davis further claims Gurlach told him that no one contacted HSU on January 16, 2017 about Davis's injured finger, citing to his own declaration. (Davis Decl. (dkt. 40) ¶ 41.) Defendants object to this proposed finding of fact on the ground that Davis's evidence about what Gurlach said constitutes inadmissible hearsay, *see* Fed. R. Evid. 802. This objection is well-taken, since Davis may not rely on his account of Gurlach's statement to prove the truth of the matter asserted –that no one actually called HSU. *See, e.g., Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2000) (finding that plaintiff could not rely on a hearsay statement to avoid summary judgment). Since this statement does not readily fall under a hearsay exception, I have not considered it for purposes of resolving defendants' motion.

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must establish (1) an objectively serious medical condition, to which (2) a state official was deliberately, that is subjectively, indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Defendants seek judgment in their favor on each element of Davis's claim against them, as well as on qualified immunity grounds.

**I. Serious Medical Need**

For Davis to avoid summary judgment on the first element, he must submit evidence from which a reasonable trier of fact could conclude that his medical need was "objectively, sufficiently serious." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). A prisoner's medical need is objectively serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zentmyer v. Kendall Cty.*, 220 F.3d 805, 810 (7th Cir. 2000). The condition need not be life-threatening; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)).

Defendants argue that Davis's finger injury did not present a serious medical condition because an injured finger is not sufficiently serious to support an Eighth Amendment violation. Defendants acknowledge, at the outset, that the Seventh Circuit has recognized that a dislocated finger may constitute a serious medical need, but insist that Davis's circumstances are notably less severe than other circumstances, since these other circumstances involved a gaping wound and open dislocation, *Perez v. Fenoglio*, 792 F.3d 768, 74-75 (7th Cir. 2015), an "openly dislocated finger" that was bent out of shape, *Edwards v. Snyder*, 478 F.3d 827, 828-29 (7th Cir. 2007), an injury later diagnosed as a broken finger, *Johnson v. Carter*, No. 12-cv-05712, 2017 WL 4122714, at *1-2 (N.D. Ill. Sept. 18, 2017); *Watkins v. Lancor*, No. 13-c-7, 2015 WL 2193862, at *5 (E.D. Wis. May 11, 2015) (same).

This may be true, but under the Seventh Circuit's current view of deliberate indifference, the fact that Davis's injury presented as less severe and was not ultimately diagnosed as a broken finger does not establish that his injury did not constitute a serious medical need, especially since Davis insists that he was in excruciating pain. The Seventh Circuit has noted that its cases "demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011).

Recognizing that these decisions are not dispositive in their favor, defendants' position is that Davis's averments about his level of pain – that he was experiencing "excruciating pain" and reported a "10 out of 10" to Nurse Gurlach – cannot create a genuine factual dispute because those statements clearly contradict the documentary evidence related to his injury. In

10

support, they point out that Davis still was able to engage in normal daily activities; that he was seen in the HSU on January 20, and that there was no note that his finger was crooked or that the skin was broken. Further, Nurse Gurlach's notes did not include that Davis reported numbness or change in skin color, but instead included a comment that Davis reported his pain at a "5-6/10" and that he could ball his fingers. (Ex. 1000 (dkt. 33-1) 4.) Defendants further point out that there was no further follow-up ordered or requested by Davis.

A court need not credit unsupported assertions that are clearly contradicted by the record. *See Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'"). However, this principle from *Scott* typically comes into play when "video footage clearly contradicts the nonmovant's claims" because the "video footage clearly settles a factual issue." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). Here, however, defendants ask that I credit the information in Davis's records and completely ignore Davis's averments. The court is not allowed to do this when deciding summary judgment. *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008) ("Credibility determinations, however, lie exclusively within the fact-finder's domain and are not appropriate for a district court to make at the summary judgment stage.").

While defendants may recite the content of Davis's medical records accurately, these records do not contain diagnostic testing or x-rays. The records are observations that were written down by Gurlach and that Davis insists are inaccurate. While defendants may be suggesting that Gurlach's notes conclusively captured Davis's condition, her notes are subject

to reasonable contradiction. In other words, a reasonable trier of fact could just as easily accept Davis's assertion that Gurlach wrote down the wrong information as it could accept that Gurlach's notes were accurate.

In any event, this argument also ignores Davis's HSR, in which he asked to be seen "ASAP" and reported that he wanted to be seen because he was "in pain" and his finger was "swollen up again" (Ex. 1000-019 (dkt. 40-2)). While Davis may not have used the word "excruciating" in his request for care, his language does not contradict his averments that his pain level was substantial. Further, there is no documentary evidence related to Davis's level of pain on January 16, right after his injury when he claims he repeatedly asked defendants to call the HSU. All we have are the averments of Davis, Gripentrog, and Steinert, none of which are conclusive evidence of Davis's pain. Accordingly, given Davis's averments about the severity of his pain, and drawing reasonable inferences in his favor, I cannot conclude that Davis's January 16 finger injury was not a serious medical need as a matter of law.

## II. Deliberate indifference

As for the second element, to prove deliberate indifference to a serious medical condition, Davis must come forward with evidence that each defendant acted with a "sufficiently culpable state of mind." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quotation omitted). This requires Davis to show that they "had *actual* knowledge that [he] was at risk of serious harm and *deliberately ignored* that risk." *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 778 (7th Cir. 2014) (emphasis in original). While a prisoner does not need to "establish that officials intended or desired the harm that transpired," *Greeno v. Daley*, 414 F.3d 645, 653 (7th

12

Cir. 2005) (citing *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)), deliberate indifference is more than negligence, or even gross negligence, *Figgs v. Dawson*, 829 F.3d 895, 902-03 (7th Cir. 2016); it is "something akin to recklessness" that "approaches intentional wrongdoing." *Arnett*, 658 F.3d at 751. Defendants seek judgment on this element of Davis's claims on the grounds that they did not have subjective knowledge that Davis's finger injury was a serious medical condition; and they neither caused the delay Davis experienced, and, in any event, the delay did not cause Davis any harm.

### A. Defendants' Subjective Knowledge

Defendants' position is that neither of them was aware that Davis's finger injury was sufficiently serious to warrant immediate attention. Gripentrog claims that Davis did not appear to him to be in extreme pain, either at 9:20 when Davis approached him and declined that he call HSU or at 9:40 when Davis asked to go to HSU. Steinert likewise claims Davis did not appear to be in extreme pain, as evidenced by Davis's ability to converse with passers-by during Davis's conversation with Steinert.

But Davis claims that he showed them both his swollen finger, told them both he dislocated his finger and popped it back in and was in excruciating pain, and that he explicitly asked for medical care. Davis further claims that Gripentrog refused to call HSU for him, asked him to wait to see HSU, told him he didn't want to deal with writing out an incident report, and then simply ordered him to go back to his cell hall. Davis claims he told Steinert that he had dislocated his finger and popped it back into place, but Gripentrog wouldn't call the HSU for him, even though he was in excruciating pain, and then Steinert instructed him to submit an HSR.

13

Rule 56 prohibits the court from picking between diametric accounts of material facts. If a jury were to believe Davis, it could reasonably conclude that both defendants had sufficient information from which to infer that Davis needed medical attention, and that both of them simply chose not to do so.

Relatedly, defendants argue that because they each contacted the HSU and relayed information about Davis, they were entitled to defer to HSU's directive to tell Davis to submit an HSR. Prison officials may be able to defer to the treatment decisions of medical professionals. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurses may generally defer to treating physician's instructions and orders) (citing *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (non-medical prison officials are not deliberately indifferent under Eighth Amendment if they investigate an inmate's complaints and find that medical staff are monitoring inmate's condition).

But this principle has limits: non-medical staff cannot leave prisoners writhing in pain. *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015) ("If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to make an effort to find a doctor, or in this case a dentist, or a technician, or a pharmacist – some medical professional."); *Smego v. Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) ("[E]ven non-medical personnel cannot stand by and ignore a detainee's complaints of serious medical issues.").

Here, Davis claims that neither defendant actually called HSU, but has not submitted any evidence beyond the fact that there is no documentation related to those alleged calls. Since it is undisputed that not every interaction between correctional officers and HSU staff must be documented, and Gripentrog and Steinert explain that their conversations were not

documented because neither of them relayed that the situation was an emergency, I accept as undisputed that Gripentrog and Steinert contacted HSU for Davis.

However, their communications with HSU do not absolve them. If I accept that both Gripentrog and Steinert contacted HSU for Davis as described in their declarations, then I must also conclude at the summary judgment stage that the information each of them relayed to HSU about Davis was inaccurate. Gripentrog claims he told HSU that Davis told him he didn't need to be seen, and Steinert told HSU that Davis was well enough to talk to other prisoners while reporting his symptoms. Davis, on the other hand, claims that his interactions with them were different and he was insistent to both about wanting to see HSU and about his extreme level of pain.

Again, since a reasonable trier of fact could conclude that Gripentrog and Steinert did not paint HSU an accurate picture of Davis's condition, I cannot conclude on this record that Gripentrog and Steinert could then rely on HSU's response.

**B. Delay**

A delay in providing medical treatment for painful, even non-life-threatening conditions, can support a deliberate indifference claim if the medical condition is sufficiently serious or painful. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (citations omitted). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Defendants argue they did not cause the four-day delay between Davis's injury

and when Nurse Gurlach examined him, since neither of them prevented Davis from submitting an HSR on January 16 or subsequently. That much is undisputed.

Again, however, if a jury were to believe Davis's account of his description of pain and his version of his requests to Gripentrog and Steinert to contact HSU, it may be reasonable to conclude that both defendants had an opportunity to provide Davis more prompt attention to his pain and deliberately chose not to try to get him seen sooner.

Defendants further contend that they were only responsible for four or five hours of a delay, since their shifts ended at about 2:00 p.m. on January 16 and they were not responsible for the fact the HSU did not see Davis about his finger until January 20. In support, defendants cite to *Watkins*, in which the court granted summary judgment in defendants' favor where the defendant did not seek medical intervention for a prisoner's injured finger even though he actually had a broken finger. *Watkins*, 2015 WL 2193862, at *6-7. In that case, the court concluded that the defendant caused a two-hour delay and did not prevent the plaintiff from asking to be seen by a medical professional. *Id.* The court further found that the delay did not support a finding of deliberate indifference because it was brief and the plaintiff's diagnosis and treatment were quite complicated, involving an x-ray and treatment only a physician could provide. *Id.* at *7.

While *Watkins* involves a very similar set of facts, there are two pivotal distinctions. First, the delay attributable to Gripentrog and Steinert was more than two hours, and the treatment necessary to address Davis's symptoms – ice, Tylenol, and tape – was not complex and was readily available. Second, while the defendant in *Watkins* undisputedly assessed the plaintiff's finger and made a judgment call about whether the plaintiff needed immediate treatment, Davis

claims that both Gripentrog and Steinert knew he was in extreme pain and saw his swelled finger but outright refused to seek medical care for him. Because of this, I am not persuaded that the reasoning used in *Watkins* applies in these circumstances.

Defendants further contend that, even assuming their delay was unreasonable, Davis failed to come forward with any "verifying medical evidence" that the delay actually caused Davis any degree of harm. To succeed on a deliberate indifference claim related to a delay, "a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). In *Williams*, the Seventh Circuit elaborated on the broad range of evidence that would satisfy this requirement:

> Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement. On the other hand, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him.

*Id.* at 715.

Here, Davis's January 16 HSR reported that he wanted to be seen "ASAP" for his pain and swelling, and the progress notes confirm that Davis continued to suffer pain on January 20 when he was seen and provided with Tylenol and tape so that Davis could play sports in the future. This evidence suggests that Davis's pain was continuous, and thus would permit a reasonable jury to conclude Gripentrog's and Steinert's failure to take seriously Davis's reports of severe pain caused Davis to suffer unaddressed pain and swelling unnecessarily for several hours. The Seventh Circuit has accepted that shorter delays, consisting of several hours, have supported a reasonable conclusion that the delay constituted deliberate indifference. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (summary judgment was inappropriate when defendant refused to provide a plaintiff his antibiotic, recognizing that "many more hours

17

of needless suffering" can constitute harm, especially since the antibiotic for plaintiff's infection was readily available). Accordingly, I am not persuaded that Davis's HSR and subsequent treatment record would not assist a jury in evaluating whether defendants' delay unnecessarily prolonged Davis's pain.

### III. Qualified Immunity

Finally, defendants seek judgment in their favor on qualified immunity grounds. "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Here, there is no question that prisoners have a clearly established right to medical care. *Lewis v. McClean*, 864 F.3d 556, 566 (7th Cir. 2017) ("[I]t has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.").

Defendants argue that they are entitled to qualified immunity because Davis's medical records show that he had only a minor finger injury that did not require immediate assessment. Yet this argument assumes their version of the facts to be true. As noted above, Davis disputes this version and presents his own version, which defendants dispute. "If there are genuine issues of fact concerning [the elements of deliberate indifference], a defendant may not avoid trial on the grounds of qualified immunity. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)

18

(citations omitted). Accordingly, defendants are not entitled to summary judgment on this defense, I'm denying defendants' motion, and this case will proceed to trial.

Shortly I will be issuing a trial preparation order, and Davis should carefully review this material to help him prepare for trial. The parties should feel free to reach out to Magistrate Judge Peter Oppeneer if they believe they can resolve this case through mediation.

ORDER

IT IS ORDERED THAT Defendants' motion for summary judgment (dkt. 28) is DENIED.

Entered this 27th day of January, 2020.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge